IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

16 DEC -2  PH 3: 43

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

ONE WORLD FOODS, INC.,
                    **Plaintiff,**

-vs-                                              Case No.  A-15-CA-1071-SS

STUBB'S  AUSTIN  RESTAURANT  COMPANY
LC; FBR MANAGEMENT, LLC; MIKE FARR;
MATT LUCKIE; and JEFF WAUGHTAL,
                    **Defendants.**

---

## O R D E R

BE IT REMEMBERED on the 13th day of October 2016, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel. Before the Court are Defendants Stubb's Austin Restaurant Company LC, FBR Management LLC, Mike Farr, Matt Luckie, and Jeff Waughtal's (Defendants) Motion to Compel Unredacted Stock Purchase Agreement [#51] and Brief in Support [#71], Plaintiff One World Foods, Inc.'s (Plaintiff) Response [#83] in opposition, and Defendants' Reply [#69] in support. Following the hearing and initial review, the Court ordered Plaintiff to submit unredacted copies of the Stock Purchase Agreement and its exhibits [#91] and Plaintiff filed the documents at issue with the Court *ex parte* [#94]. Having reviewed the documents, the arguments of the parties at the hearing, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

## Background

### I.    A Saucy Dispute

This case centers on who has the right to the legacy of famed Texas barbecue restauranteur C.B. "Stubb" Stubblefield through ownership and use of a variety of STUBB'S marks.[1]

Plaintiff is in the business of making and selling STUBB'S barbecue sauces, rubs, and marinades. Am. Compl. [#24] ¶ 1. Defendants own or operate restaurants in Austin, Texas. *Id.* ¶¶ 2–5. Defendant Stubbs Austin Restaurant Company LC (SARC) owns and operates a barbecue restaurant called Stubb's Bar-B-Q at 801 Red River Street in Austin, Texas (Stubb's Red River St.). *Id.* ¶¶ 2, 26. SARC also offers catering services using the STUBB'S marks at a bar called the Mean Eyed Cat. Defendants Mike Farr, Matt Luckie, and Jeff Waughtal operate a mixed restaurant and retail venue on the outskirts of Austin called Graceland Grocery, which includes a barbecue restaurant called Stubb's Bar-B-Q at Graceland Grocery (Graceland Grocery). *Id.* ¶¶ 4, 27. Finally, Defendant FBR Management LLC (FBR) owns a tavern in Austin called Lala's Little Nugget. *Id.* ¶ 4. Defendants plan to serve barbecue under the STUBB'S mark at Lala's Little Nugget. *Id.* ¶ 30; Defs.'s Answer [#30] ¶ 30.

According to Plaintiff, it acquired all intellectual property interests from restauranteur Stubb. It then granted permission to SARC to use the STUBB'S marks to open Stubb's Red River St. and authorized SARC to provide catering services using the STUBB'S marks at Mean Eyed Cat. Am. Compl. [#24] ¶ 26. Plaintiff claims this arrangement was an implied trademark license of the STUBB'S marks, limited only to restaurant services at Stubb's Red River St. and catering services at Mean Eyed Cat. *Id.* Consequently, Plaintiff filed this suit in November 2015, alleging the use of the STUBB'S marks at Graceland Grocery and Lala's Little Nugget violates the implied trademark license and seeking

---

[1] While the scope of the marks at issue has yet to be precisely defined, the parties appear to be contesting the use of the word STUBB'S and images of restauranteur "Stubb" in connection with barbecue sauces, marinades, and rubs; restaurant and catering services; entertainment and live music services; as well as on products such as t-shirts, beverage containers, aprons, and caps. *See* Am. Compl. [#24]; Defs.'s Answer [#30].

-2-

to stop the use of the STUBB'S marks at any unauthorized locations as well as damages. *Id.* ¶¶ 27–31, 36–76. Plaintiff has numerous registrations for the STUBB'S marks. *Id.* ¶¶ 13–25.

Defendants, on the other hand, claim SARC never operated under a license from Plaintiff but SARC and Plaintiff peacefully coexisted for twenty years: Plaintiff used the STUBB'S marks for barbecue sauce, marinades, and related goods while SARC used the STUBB'S marks for restaurant, catering, and entertainment services. Defs.' Answer [#30] ¶¶ 6–18. Thus, Defendants claim Plaintiff never owned the STUBB'S marks and Plaintiff fraudulently filed for numerous trademark registrations. *Id.* ¶¶ 24–28. Additionally, Defendants counterclaim Plaintiff is improperly using SARC's signage on its barbecue sauce labels. *Id.* ¶¶ 38–59.

## II.     Relations Between Plaintiff and SARC

Plaintiff and SARC have interacted for more than a decade. The Court highlights the most salient details here.

Plaintiff first filed with the United States Patent and Trademark Office (USPTO) to register the STUBB'S word mark in 2004. Am. Compl. [#24] ¶ 14. Plaintiff has continued to file a variety of registrations for the STUBB'S marks. *Id.* ¶ 15–24. Starting in 2010, SARC attempted to register a series of STUBB's marks with the USPTO for its combination of restaurant and live music services, but the USTPO denied the applications finding a likelihood of confusion between SARC's alleged marks and Plaintiff's prior trademark registrations. *Id.* ¶ 32–35. SARC filed responses to the denied applications informing the USPTO "One World Foods appears to have in[]appropriately used applicant's trademark usage as its own as evidenced by One World Foods using pictures of applicant['s] venue as specimens of use to obtain a registration." Liou Decl. [#54-1] ¶ 7.

At some point in August 2011, SARC manager Jeff Waughtal met with Plaintiff's then-CEO Matt Gase. After their meeting, Waughtal sent Case a note summarizing his thoughts on "the brand issues." Liou Decl. Ex. D [#53-3]. Attempting to "figure out if we can resolve the situation[,]"

Waughtal wrote the "fundamental difference in our perspectives, as to who is benefitting who in this relationship, is w[h]ere the break down always seems to occur." *Id.* Waughtal concluded by writing, "If you think I am wrong, or see another way we might resolve the issue, I am happy to listen. But if not, I suppose it is best to let sleeping dogs lie and keep doing what we are doing." *Id.*

In 2013, Plaintiff and SARC began exploring options to expand the STUBB'S restaurant and entertainment concept with other investors. Pl.'s Mot. Disqualify [#56] at 3; Mot. Quash [#60] at 2. With other investors, Plaintiff and SARC discussed establishing "Newco." *Id.* Although the negotiations to form Newco eventually failed, the negotiations continued off and on until 2015 when Plaintiff entered into negotiations to sell its stock to McCormick & Company (McCormick). *See* Pl.'s Mot. Disqualify [#56] at 3–5; Mot. Quash [#60] at 2–5; Pl.'s Resp. to Mot. Compel [#83] at 5. About this time, Plaintiff's attorney Lawrence Waks claims he was informed "by either Matt Gase or John Scott, both executives with [Plaintiff], that a SARC executive or executives were upset about the turn of events and threatened [Plaintiff] with some sort of legal action." Waks Decl. [#54-8] ¶ 5.

### III.   McCormick Purchases Plaintiff

In the spring of 2015, McCormick offered to buy Plaintiff for approximately $100 million. Defs.' Mot. Compel [#51] at 2. As a prerequisite to finalizing the deal, McCormick required a written license agreement with SARC. Pl.'s Resp. to Mot. Compel [#83] at 5. Thus, McCormick also offered SARC $7 million if SARC would agree (a) Plaintiff owned all rights in the STUBB's marks and SARC owned no rights in those marks and (b) to enter into a written license agreement with Plaintiff for the use of the STUBB'S marks. Defs.' Mot. Compel [#51] at 2. SARC refused.

McCormick nevertheless proceeded with the purchase of Plaintiff, and a Stock Purchase Agreement (SPA) between Plaintiff and McCormick memorialized the transaction. *Id.* "McCormick agreed to close instead with the condition that Plaintiff share with it the opinions Plaintiff's counsel had previously prepared regarding the ownership and validity of the STUBB'S trademark." Pl.'s Resp. to

Mot. Compel [#83] at 5. Those opinions were attached to the SPA as Exhibit B-1 and Exhibit B-2 (the Opinion Exhibits).

The SPA describes the conditions governing the purchase and sale of Plaintiff as well as the representations and warranties made by both McCormick and Plaintiff. The only threat of litigation Plaintiff identified at the time of the SPA was a demand for payment related to a terminated software subscription. Defs.' Br. Supp. Mot. Compel Ex. 1 [#71-1], Disclosure Schedule 3.06. In fact, the only litigation currently pending to the knowledge of the undersigned was initiated by the Plaintiff.

Additionally, McCormick required Plaintiff to place $10 million in escrow to pay for tax matters and the following items:

> all losses, damages, claims, costs and expenses, interest, awards, judgments and penalties . . . actually incurred or suffered by [McCormick] arising out of or resulting from (i) the breach of any representation or warranty made by [Plaintiff] contained in this Agreement, (ii) the breach of any covenant or agreement by [Plaintiff] contained in this Agreement, (iii) any Claim arising out of or in connection with the merger . . . including any such Claim brought by a holder of Shares who is not a Selling Shareholder, or (iv) the certain demand letter dated June 18, 2015 [relating to a terminated software subscription.]

*Id.* at 35, 44–47. Plaintiff claims the $10 million escrow amount was to secure McCormick against claims by SARC regarding the STUBB'S trademark services as well as other claims. Pl.'s Resp. to Mot. Compel [#83] at 5.

## IV.  Documents Sought

In their motion to compel, Defendants seek access to an unredacted version of the SPA. Defs.' Mot. Compel [#51]. While Plaintiff previously produced a redacted version of the SPA and its exhibits, Defendants claim the redactions block Defendants from the full extent of Plaintiff's representations on its trademark rights to McCormick. Defs.' Br. Supp. Mot. Compel [#71] at 1–2. Plaintiff, by contrast, claims the redacted information in the SPA is sensitive personal and commercial information. Pl.'s Resp. to Mot. Compel [#83] at 1. Defendants also claim Plaintiff waived any attorney–client privilege

by disclosing the Opinion Exhibits to McCormick, a third party. Defs.' Br. Supp. Mot. Compel [#71] at 4–13. Plaintiff denies any waiver, asserting the common legal interest (CLI) privilege extends attorney–client privilege to cover Plaintiff's disclosure of the Opinion Exhibits to McCormick.

After initial review of Defendants' motion to compel, the Court ordered Plaintiff to submit unredacted copies of the SPA and its exhibits to the court for *in camera* examination. Although discretion prevents the Court from fully discussing the documents' contents, a general review of content and form is relevant for this Court's analysis.

With the exception of the Opinion Exhibits, the information redacted from the SPA features financial data, employee data, and the names of third parties with whom Plaintiff had commercial relationships. The Opinion Exhibits are structured as legal memoranda from Plaintiff's attorney Lawrence Waks addressed to Plaintiff and McCormick, specifically McCormick's vice president, general counsel, and secretary. Both of the Opinion Exhibits are labeled "Privileged and Confidential" at the top of their first pages and were explicitly "provided at your request as an opinion and analysis of" Plaintiff's trademark rights.

### Analysis

As a starting point for any discovery dispute, the Federal Rules of Civil Procedure define the scope of discovery: a party may discover "any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b). Discovery outside of this scope is not permitted. *Id.* at (b)(2)(C)(iii). Information "need not be admissible in evidence to be discoverable." *Id.* at (b)(1).

While the parties predominately argue over the production of the Opinion Exhibits, Defendants also seek access to a complete version of the SPA.[2] The Court addresses SPA redactions cumulatively before separately turning to the Opinion Exhibits.

---

[2] Defendants only agree to the redaction of social security and bank account numbers from the SPA. Defs' Br. Supp. of Mot. Compel [#71] at 3 n.1.

## I.     Unfettered Access to the SPA

Defendants insist the SPA is a key piece of evidence because it demonstrates what representations Plaintiff made to McCormick regarding intellectual property rights and the license agreement, or lack thereof, between Plaintiff and SARC. Arguing the designation of "Attorney's Eyes Only" and the Court's Protective Order render Plaintiff's concerns about the release of private information uncalled for, Defendants request unfettered access to the SPA.

But, except for the Opinion Exhibits, Defendants fail to specifically argue how any of the other redacted sections of the SPA might contain relevant information to either party's claim or defense. Instead, Defendants focus on how a redacted SPA will make it more difficult to pose questions to witnesses. Defs.' Br. Supp. Mot. Compel [#71] at 3. The Court, however, is not concerned with Defendants' inability to rephrase their questions to witnesses. The pertinent inquiry for discovery is relevance.

After reviewing the redacted sections of the SPA *in camera*, the Court is convinced that the redacted portions contain irrelevant and sensitive personal and commercial information, nearly all of which relate to third parties. The Court agrees with Plaintiff: the redactions should not stop Defendants from asking witnesses about shareholder knowledge, shareholder bias, or representations to third parties concerning Plaintiff's relationship with SARC. Therefore, the redactions to the SPA properly withheld sensitive, irrelevant information.

## II.     The Opinion Exhibits

Although Defendants request complete access to the SPA and its exhibits, Defendants focus the majority of their motion to compel on the two legal opinions contained in the Opinion Exhibits. Unlike the other redacted portions of the SPA, relevance of the Opinion Exhibits is uncontested. *See* Pl.'s Resp. to Mot. Compel [#83] at 1–2. Instead, Plaintiff claims these exhibits are shielded from discovery by the CLI privilege's extension of attorney–client privilege. Although Plaintiff refers to the

Opinion Exhibits in the SPA as the legal opinions of Plaintiff's counsel "regarding [Plaintiff's] rights in certain [sic] the Company Intellectual Property[,]"[3] Defendants do not concede the documents contain attorney–client communications that could be privileged and nevertheless requested *in camera* review. Defs.' Br. Supp. Mot. Compel [#71] at 4. But Defendants argue if the Opinion Exhibits are protected by attorney–client privilege, that privilege applied only to Plaintiff. Defendants claim in disclosing the Opinion Exhibits to McCormick as a third-party, Plaintiff waived its attorney–client privilege. Plaintiff denies any such waiver, arguing the CLI privilege extends its attorney-client privilege to communications with McCormick.

### A.   Attorney–Client Privilege

Because the assertion of privilege inhibits the search for truth, courts generally construe privilege exemptions narrowly. *See Trammel v. United States,* 445 U.S. 40, 50 (1980); *In re Santa Fe Int'l Corp.,* 272 F.3d 705, 710 (5th Cir. 2001). Attorney–client privilege protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege. *United States v. Jicarilla Apache Nation,* 564 U.S. 162, 190 (2011) (citing *Fisher v. United States,* 425 U.S. 391, 403 (1976)). "Only communications made 'for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding' are privileged." *Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy,* No. SA-14-CV-35-OLG, 2014 WL 12497027, at *2 (W.D. Tex. Sept. 8, 2014) (quoting *United States v. Harrelson,* 754 F.2d 1153, 1167 (5th Cir. 1985)). Communications with an attorney made for the purpose of obtaining "business or technical advice or management decisions" are not privileged. *Stoffels v. SBC Commc'ns, Inc.,* 263 F.R.D. 406, 411 (W.D. Tex. 2009) (citing *Navigant Consulting, Inc. v. Wilkinson,* 220 F.R.D. 467, 474 (N.D. Tex. 2004)).

---

[3] Defs' Br. Supp. Mot. Compel Ex. 1 [#71-1], at 13.

The party asserting a privilege exemption from discovery must demonstrate its applicability. *See* FED. R. CIV. P. 26(b)(5); *In re Santa Fe,* 272 F.3d at 710. The privileged claimant's burden extends to preliminary facts showing that the matter is eligible for protection. *Id.* at 710 n.7. Additionally, a party asserting attorney–client privilege must prove that waiver by breach of confidentiality did not occur. *Hodges, Grant & Kaufmann v. U.S. Gov't, Dept. of the Treasury, I.R.S.,* 768 F.2d 719, 721 (5th Cir. 1985); *Perez v. Perry,* No. SA-11-CV-360-OLG-JES-XR, 2014 WL 3359324, at *1 (W.D. Tex. July 9, 2014). In particular, attorney–client privilege is waived if a confidential communication has been disclosed to a third party, unless the communication is made to further a common legal interest. *In re Santa Fe,* 272 F.3d at 711–12 (citing *Aiken v. Tex. Farm Bureau Mutual Ins. Co.,* 151 F.R.D. 621, 623 (E.D. Tex.1993) and *In re Auclair,* 961 F.2d 65, 69 (5th Cir. 1992)).

Here, *in camera* review confirms the Opinion Exhibits contain legal memoranda created for the express purpose of providing legal opinions on Plaintiff's intellectual property rights. But Plaintiff notes its attorney had previously prepared these legal memoranda and later Plaintiff shared the memoranda with McCormick as a condition of McCormick's purchase of Plaintiff's stock. Pl.'s Resp. to Mot. Compel [#83] at 5 ( "McCormick agreed to close instead with the condition that Plaintiff share with it the opinions Plaintiff's counsel had previously prepared regarding the ownership and validity of the STUBB'S trademark." ). Thus, while the legal memoranda were originally communications between Plaintiff and its attorney made for the purpose of securing legal advice, the legal memoranda were disclosed to McCormick as the Opinion Exhibits to support the sale of Plaintiff's stock, a business decision.

As the party asserting attorney–client privilege, Plaintiff bears the burden of proving the privilege applies and that burden extends to proof of preliminary facts showing the matter is eligible for protection. *See In re Santa Fe,* 272 F.3d at 710. & n.7. Plaintiff meets this burden with regard to the initial legal memoranda. *See Nguyen v. Excel Corp.,* 197 F.3d 200, 206 (5th Cir. 1999) (stating a

"client's specific request and pertinent information related thereto" and "research undertaken by an attorney to respond to a client's request" both fall under the protection of attorney–client privilege). But Plaintiff makes no claim it and McCormick jointly consulted Plaintiff's attorney or fundamental attorney–client privilege applies, claiming only that any disclosure to McCormick fell within the scope of the CLI privilege. Pl.'s Resp. to Mot. Compel [#83] at 1–2.

Consequently, while Plaintiff demonstrates attorney–client privilege applied to the initial version of the legal memoranda, attorney–client privilege does not apply to the disclosure of the legal memoranda to McCormick via the Opinion Exhibits. The remaining inquiry thus focuses on whether the CLI privilege exception applies.

### B.      Common Legal Interest Privilege

Responding to Defendant's allegation of waiver, Plaintiff argues the disclosure of the Opinion Exhibits to McCormick is protected by the CLI privilege. Pl.'s Resp. to Mot. Compel [#83] at 3–7. In the Fifth Circuit, only two types of communications are protected under the CLI privilege: (1) communications between co-defendants in actual litigation and their counsel and (2) communications between potential co-defendants and their counsel. *In re Santa Fe*, 272 F.3d at 710 (citations omitted). While "the term potential has not been clearly defined[,]" it is construed narrowly to protect only "necessary consultation between legal advisers and clients." *Id.*

Consequently, for parties to be potential co-defendants, the Fifth Circuit has held there must be a "palpable threat of litigation at the time of the communication, rather than a mere awareness that one's questionable conduct might some day result in litigation, before communications between one possible future co-defendant and another . . . could qualify for protection." *Id.* at 711. But if "the threat of litigation is merely a thought rather than a palpable reality, the joint discussion is more properly characterized as a common business undertaking, which is unprivileged, and certainly not a common legal interest." *Id.* at 714. Furthermore, CLI privilege does not apply if "a group of individuals seek

legal counsel to avoid conduct that might lead to litigation, but rather only [applies] if they request advice to prepare for litigation." *United States v. Newell,* 315 F.3d 510, 525 (5th Cir. 2002) (internal quotations omitted).

As there was no actual litigation when Plaintiff disclosed the Opinion Exhibits to McCormick, the first type of communication protected by CLI privilege does not apply here. The question is then whether the Opinion Exhibits fall in the second category of communications: are the Opinion Exhibits communications between potential co-defendants made in light of a palpable threat of litigation? After examining the evidence provided by both parties concerning relations between SARC and Plaintiff in the period surrounding the disclosure of the Opinion Exhibits to McCormick, the Court finds no palpable threat of litigation.[4]

Although Plaintiff claims Defendants threatened litigation, Plaintiff provides limited evidence of such a threat. Plaintiff relies on a claim by its attorney that an unspecified executive from Plaintiff commented "a SARC executive or executives were upset about the turn of events and threatened [Plaintiff] with some sort of legal action." Such an allegation is insufficient to establish a palpable threat of litigation. *See Auclair,* 961 F.2d at 69 (finding the CLI privilege applicable to communication involving multiple clients consulting an attorney in connection with a pending grand jury investigation); *see also BCR Safeguard Holding,* 614 F. App'x at 704 n.20 (concluding CLI privilege did not apply to communication between a parent company and subsidiary company's counsel where the communication was not made to further prosecution of litigation). Plaintiff also selectively quotes the August 2011 email SARC manager Jeff Waughtal sent to Plaintiff's then-CEO Matt Gase, attempting

---

[4] The Fifth Circuit has not addressed whether the CLI privilege is inapplicable to co-plaintiffs and specifically declined to examine whether the CLI privilege could apply to communications between potential co-plaintiffs. *BCR Safeguard Holding, L.L.C. v. Morgan Stanley Real Estate Advisor, Inc.,* 614 F. App'x 690, 704 (5th Cir. 2015); *see also Benson v. Rosenthal,* No. CV 15-782, 2016 WL 3001129, at *4 (E.D. La. May 25, 2016) (discussing the Fifth Circuit's decisions on who can assert the CLI privilege). Here, although Plaintiff is the party seeking the protections of the CLI privilege, the Court need not consider if Plaintiff is a proper party to assert the privilege because the Court concludes the communication at issue was not made in light of a palpable threat of litigation.

to paint relations between SARC and Plaintiff as acrimonious. *See* Pl.'s Resp. to Mot. Compel [#83] at 4. But review of the entire email reveals SARC was hoping to work out the brand issues with Plaintiff and at worst wanted to "let sleeping dogs lie and keep doing what we are doing." Liou Decl. Ex. D [#53-3].

Other evidence further undermines Plaintiff's assertion there was a palpable threat of litigation. Plaintiff admits SARC and Plaintiff engaged in discussions to form a new business entity, Newco, off and on from 2013 until 2015 when Plaintiff entered into negotiations to sell its stock to McCormick & Company. It is unlikely Plaintiff would have continued to consider creating a new business endeavor with an entity threatening imminent litigation. Moreover, the SPA itself does not list SARC as a possible litigation threat. Although the SPA required Plaintiff to disclose any existing or anticipated litigation, the only threat Plaintiff named was a demand for payment related to a terminated software subscription. Furthermore, it is Plaintiff, not SARC, who ultimately decided to bring the disagreements between it and SARC to the level of a lawsuit.

In an effort to bolster its claim SARC threatened it with litigation, Plaintiff points to the $10 million escrow amount required by the SPA as evidence of the threat SARC posed. Plaintiff alleges the escrow payment was intended to secure McCormick against claims by SARC regarding the STUBB'S trademark services as well as other claims. Pl.'s Resp. to Mot. Compel [#83] at 5. But Plaintiff's characterization of the escrow payment attempts to sweep under the rug the fact the escrow payment secured McCormick against all loses and claims, including tax matters. The SPA even explicitly names the demand for payment related to the terminated software subscription as loss from which the escrow payment would protect McCormick but does not name any claim by SARC. Defs.' Br. Supp. Mot. Compel Ex. 1 [#71-1], at 35, 44–47.

Rather than sharing the Opinion Exhibits with McCormick to prepare for litigation, Plaintiff shared the Opinion Exhibits with McCormick as a condition of the sale of Plaintiff's stock. *See* Pl.'s

Resp. to Mot. Compel [#83] at 5. Plaintiff appears to have been motivated to disclose the Opinion Exhibits to validate the sale terms. Such a communication more closely aligns with a common business undertaking than preparation for litigation and is therefore not protected by the CLI privilege. *See In re Santa Fe,* 272 F.3d at 714 (characterizing an exchange legal information, which allegedly contained confidences, between competitors in the absence of an actual, or imminent, or at least directly foreseeable, lawsuit as an unprivileged common business undertaking); *Acad. of Allergy*, 2014 WL 12497027, at *4 (holding an email exchange between defendants concerned a common business undertaking because the exchange was made under an awareness that conduct may some day result in litigation rather than in response to a palpable threat of litigation).

Thus, the Court concludes the CLI privilege does not apply to the disclosure of the Opinion Exhibits to McCormick. Because Plaintiff waived its attorney–client privilege by disclosing the Opinion Exhibits to McCormick, they should be produced. The Court therefore grants Defendants' motion to compel with respect to the Opinion Exhibits.

### Conclusion

In total, the Court finds Defendants are not entitled to an unredacted version of the SPA because there is no indication the redacted portions of the SPA are relevant to this case. However, Defendants are entitled to the Opinion Exhibits because these exhibits are relevant and Plaintiff waived its attorney–client privilege in disclosing them to McCormick. Finally, the CLI privilege does not apply because the disclosure of the Opinion Exhibits was not made in light of a palpable threat of litigation. Thus, the Court DENIES Defendants' motion to compel a complete version of the SPA but GRANTS the motion as to the Opinion Exhibits.

Accordingly,

IT IS ORDERED that Defendants' Motion to Compel Unredacted Stock Purchase Agreement [#51] is DENIED IN PART with respect to the redacted portions of the SPA agreement and the associated exhibits, except Exhibit B-1 and Exhibit B-2;

IT IS FURTHERORDERED that Defendants' Motion to Compel Unredacted Stock Purchase Agreement [#51] is GRANTED IN PART with respect to Exhibit B-1 and Exhibit B-2; and

IT IS FINALLY ORDERED that Plaintiff produce to Defendants unredacted copies of Exhibit B-1 and Exhibit B-2 within SEVEN (7) business days of this order.

SIGNED this the 2nd day of December 2016.

SAM SPARKS
UNITED STATES DISTRICT JUDGE